1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE EASTERN DISTRICT OF CALIFORNIA

9   SHIRLEY ANN HALL,

10            Plaintiff,                    No. CIV S-05-1050 GGH

11       vs.

12
    MICHAEL J. ASTRUE,[1]                   ORDER
13  Commissioner of
    Social Security,
14
              Defendant.
15  _____/

16            Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17  Security ("Commissioner") denying her application for Supplemental Security Income ("SSI")

18  under Title XVI of the Social Security Act ("Act").  For the reasons that follow, plaintiff's

19  Motion for Summary Judgment or Remand is granted in part, the Commissioner's Cross Motion

20  for Summary Judgment is denied, and this matter is remanded to the ALJ for further findings as

21  directed in this opinion.  The Clerk is directed to enter judgment for plaintiff.

22  \\\\\

23  \\\\\

24  _____

25       [1]  Michael J. Astrue became Commissioner on February 12, 2007.  Accordingly, he
    should be substituted as defendant in this suit.  Fed. R. Civ. P. 25(d)(1).  No further action need
26  be taken by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §
    405(g).

BACKGROUND

Plaintiff, born September 19, 1959, applied for disability benefits on February 4, 2003. (Tr. at 44.) Plaintiff alleged she was unable to work since July 15, 1993, due to skull fractures, double vision resulting from an eye injury, and memory problems including short term memory loss. (Tr. at 44, 52.) Plaintiff had previously received SSI benefits in 1995 for disability since July 15, 1993, but they were terminated in July, 2001, for reasons not based on plaintiff's disability.[2] (Tr. at 11-12.) Plaintiff's current application seeks benefits dating back to her original onset date. In a decision dated December 5, 2004, ALJ Robert K. Rogers, Jr., determined that plaintiff was not disabled.[3] The ALJ made the following findings:

---

[2] The record is a little unclear, but apparently the termination was due to a conviction and incarceration for drug possession. (Tr. at 12, 264-66.)

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

1

2

    1.    The claimant has not engaged in substantial gainful activity since January 13, 2003.

3

4

5

6

    2.    The medical evidence establishes that the claimant has severe poly-substance dependence, in sustained remission; dependent personality disorder; and mild organic brain damage; left exotropia, traumatic mydriasis, and myopia, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

7

8

    3.    The claimant's testimony is not fully credible with respect to her alleged double vision, chronic migraine type headaches, and ongoing memory deficits for the reasons set forth in the body of this decision.

9

10

11

12

    4.    The claimant has no impairment based exertional limits on her ability to work.  She cannot perform work that requires excellent vision or depth perception.  She can not work at unprotected heights, around dangerous machinery or drive. She can understand, remember and carry out simple job instructions and tasks, but not detailed or complex job instructions or tasks.  (20 CFR § 416.945)

13

    5.    The claimant has no past relevant work experience.

14

    6.    The claimant is 45 years old, which is defined as a younger individual (20 CFR § 416.963).

15

16

    7.    The claimant has a high school education (20 CFR § 416.964).

17

18

    8.    The issue of transferability of work skills is not material. (20 CFR § 416.968).

19

20

21

    9.    Considering the types of work which the claimant is still functionally capable of performing in combination with her age, education and work experience, she can be expected to make a vocational adjustment to work which exists in significant numbers in the national economy.  Examples of such jobs are addresser, order caller, and ticket taker.

22

23

    10.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)).

24  (Tr. at 15-16.)

25  \\\\\

26  \\\\\

1  ISSUES PRESENTED

2          Plaintiff has raised the following issues: (A) Whether the ALJ Erred in Not

3  Considering the Earlier Favorable Decision; (B) Whether the Commissioner Erred in Failing to

4  Fully and Fairly Develop the Record;[4] (C) Whether the ALJ Erred in Failing to Find All of

5  Plaintiff's Impairments to be Severe; (D) Whether the ALJ Failed to Properly Evaluate the Lay

6  Witness Testimony of Mr. Eaton; (E) Whether the ALJ Failed to Properly Evaluate Plaintiff's

7  Subjective Complaints; (F) Whether the ALJ Failed to Provide a Complete Hypothetical to the

8  Vocational Expert; and (G) Whether the ALJ Erred by not Finding that Plaintiff had Non-

9  exertional Impairments.

10  LEGAL STANDARDS

11          The court reviews the Commissioner's decision to determine whether (1) it is

12  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

13  the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

14  Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v.

15  Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might

16  accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct.

17  1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206

18  (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical

19  testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir.

20  2001) (citations omitted). "Where the evidence is susceptible to more than one rational

21  interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

22  Thomas v. Barnhart, 278  F.3d 947, 954 (9th Cir. 2002).

23  \\\\\

24  _____

25          [4] Plaintiff raises the issue of the ALJ's alleged failure to consider medical records
relating to plaintiff's motorcycle accident, but does not brief it as a separate issue.  It will be
26  discussed in the context of this issue.

4

1   ANALYSIS

2       A.   Whether the ALJ Erred in Not Considering the Earlier Favorable Decision

3           Plaintiff claims that the earlier disability determination should serve to preclude

4   relitigation of this issue in the instant action.  Defendant's citation to Warren v. Bowen, 804 F.2d

5   1120 (9th Cir. 1987), is factually on point and defeats plaintiff's argument.  There, as here,

6   disability benefits had been terminated for a reason unrelated to the disability.  Id. at 1121.  Three

7   years later, the plaintiff reapplied for benefits, claiming a presumption of continuing disability.

8   The court found that res judicata did not apply where the issue of plaintiff's disability at an

9   earlier date was not contested.  The presumption of disability lasts only one year as the

10  regulations control termination of benefits based on non-medical grounds.  20 C.F.R. § 416.1335.

11  As plaintiff filed her new application three years later, this regulation, which carries the force of

12  law, controls.

13          In this case like in Warren, the original finding of disability was terminated for

14  non-medical reasons.  Plaintiff filed the most recent application more than a year after that

15  termination.  Therefore, the Commissioner is not precluded from disputing the issue of current

16  disability.

17      B.   Whether the Commissioner Erred in Failing to Fully and Fairly Develop the Record

18          Plaintiff claims that the ALJ failed to develop the record by giving only historical

19  weight to plaintiff's medical records from her prior application which pertain to her motorcycle

20  accident of 1989, which caused her mental impairments.  She also claims the ALJ should have

21  developed the record further in regard to plaintiff's double vision since she had been diagnosed

22  with exotropia which is known to cause double vision.

23          Disability hearings are not adversarial.  Dixon v. Heckler, 811 F.2d 506, 510 (10th

24  Cir. 1987) (holding that ALJ has basic duty to "inform himself about facts relevant to his

25  decision") (quoting Heckler v. Campbell, 461 U.S. 458, 471 n.1 (1983) (Brennan, J.,

26  concurring)).  The ALJ must fully and fairly develop the record, and when a claimant is not

1   represented by counsel, an ALJ must be "especially diligent in exploring for all relevant facts."

2   Tonapetyan v. Halter, 242 F.3d 1144 (9th Cir. 2001).[5]  The duty also is heightened in the case of

3   a mentally ill claimant who may not be able to protect him or herself.  Id.

4          Evidence raising an issue requiring the ALJ to investigate further depends on the

5   case.  Generally, there must be some objective evidence suggesting a condition which could have

6   a material impact on the disability decision.  See Smolen v. Chater, 80 F.3d 1273, 1288 (9th

7   Cir.1996); Wainwright v. Secretary of Health and Human Services, 939 F.2d 680, 682 (9th

8   Cir.1991).  "Ambiguous evidence . . . triggers the ALJ's duty to 'conduct an appropriate

9   inquiry.'"  Tonapetyan, 242 F.3d at 1150 (quoting Smolen, 80 F.3d at 1288.)

10          The ALJ can develop the record by (1) making a reasonable attempt to obtain

11   medical evidence from the claimant's treating sources, (2) ordering a consultative examination

12   when the medical evidence is incomplete or unclear and undermines ability to resolve the

13   disability issue; (3) subpoenaing or submitting questions to the claimant's physicians; (4)

14   continuing the hearing; or (5) keeping the record open for supplementation.  See Tonapetyan, 242

15   F.3d. at 1150; 20 C.F.R. 404.1517, 416.917; 42 U.S.C. § 423(d)(5)(A), (B).  Ordering a

16   consultative examination ordinarily is discretionary, see Wren v. Sullivan, 925 F.2d 123, 128

17   (5th Cir.1991); Jones v. Bowen, 829 F.2d 524, 526 (5th Cir.1987), and is required only when

18   necessary to resolve the disability issue.  See Reeves v. Heckler, 734 F.2d 519, 522 (11th

19   Cir.1984); Turner v. Califano, 563 F.2d 669, 671 (5th Cir.1977).

20          The ALJ stated that he would give only historical weight to plaintiff's previous

21   medical records because they pertain to a decision regarding disability as of May, 1995.  (Tr. at

22   11.)  Plaintiff objects to this limited consideration as it concerns her mental impairments.

23          It is not completely clear what the ALJ meant when referencing past medical

24   evidence only for  "historical purposes."  The commonly known definition of historical is one

25

26          [5]  See also Crane v. Shalala, 76 F.3d 251, 255 (9th Cir.1996) (ALJ has duty to develop the
     record even when claimant is represented).

1  which would simply note the past evidence as being present, but of little or no relevance for the

2  current assessment.  Assuming the ALJ was using the commonly known meaning, and the

3  decision certainly does not reflect a heavier usage, the ALJ was in error.  The value of past

4  medical evidence upon which a disability finding was made depends on the facts and

5  circumstances of the medical condition, and is an issue separate and apart from res judicata and

6  collateral estoppel.  For some conditions, the value of past records may be very great, for others,

7  almost of complete irrelevancy.  Certain medical conditions do not change or change much over

8  time, and others can change markedly.  The fact that plaintiff suffered organic brain damage from

9  a traumatic event suggests that the evidence at or about the time of the event would be important

10  to assess.  The ALJ should have acquired such evidence from the past SSA records.  This is so

11  because the consultative examinations, performed on a one or two shot basis, can often tell us

12  less than the complete picture, i.e, they give a snapshot on a particular day.  At the very least, the

13  ALJ should opine why the records have no value if that is the ultimate determination.

14         The consulting psychological evaluations obtained by the ALJ were both

15  conducted by Dr. Bradley, on April 11, 2003, and June 18,2004.  At the first exam, this

16  psychologist performed some tests which resulted in disparate scores, indicating organic brain

17  damage, secondary to traumatic brain injury from a 1989 motorcycle accident.  (Tr. at 127, 128.)

18  She noted that plaintiff had a long history of drug and alcohol abuse which was in remission

19  according to her own report; however, this psychologist questioned her statement that she has not

20  engaged in substance abuse in eight or nine years.  The reasoning for this doubt was plaintiff's

21  inability to adequately explain her current three years probationary status based on what she

22  asserts was exoneration of criminal activity.  (Id. at 126, 128.)  Further, she admitted to a

23  criminal history based on selling drugs but her current recall of the number of times that she was

24  incarcerated differed from her report to a Dr. Otani in 1989.  (Tr. at 128.)  In addition to

25  polysubstance dependence (in remission by plaintiff's report) and organic brain damage, Dr.

26  \\\\\\

7

1   Bradley also diagnosed antisocial personality disorder and a GAF of 60.[6]  This psychologist

2   concluded that plaintiff could not handle her own funds due to previous substance abuse;

3   however, she could understand, remember and carry out simple instructions.  (Id. at 128.)  She

4   could also interact appropriately with supervisors, coworkers and the public.  Plaintiff could also

5   act appropriately in regard to attendance and safety at work, as well as changes in a routine work

6   setting.  She was found to be at the upper end of the low average range and her memory was

7   functioning at the low average to high average range.  Plaintiff was found to be not disabled in

8   regard to her memory and intellect.  (Id.)

9          Dr. Bradley's more recent report assigns plaintiff a GAF of 70.[7]  At this June 18,

10  2004 exam, plaintiff was diagnosed with polysubstance dependence which was now in sustained

11  remission and based on secondary documentation.[8]  (Tr. at 255.)  Dr. Bradley changed her

12  previous diagnosis from antisocial personality disorder to dependent personality disorder, severe,

13  based on the opinion that plaintiff's antisocial acts were later in life and she did not exhibit the

14  other characteristics of antisocial personality disorder, such as animal cruelty, bedwetting, and

15  arson.  (Id. at 255.)  Once again plaintiff was diagnosed with organic brain damage but organicity

16  was mild.  (Id.)  Dr. Bradley also noted occupational problems, but once again opined that

17  plaintiff could understand, remember and carry out simple instructions.  At this time, plaintiff

18  could handle her own funds.  She could once again interact appropriately with supervisors,

19

20        [6]  GAF is a scale reflecting the "psychological, social, and occupational functioning on a
      hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental
      Disorders 32 (4th ed.1994) ("DSM IV").  According to the DSM IV, a GAF of 60 indicates
21    moderate symptoms such as flat affect, circumstantial speech, occasional panic attacks, or
      moderate difficulty in functioning as in few friends or conflicts with peers or co-workers.

22
          [7]  A GAF of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild
23    insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional
      truancy, or theft within the household), but generally functioning pretty well, has some
24    meaningful interpersonal relationships."  DSM IV.

25        [8]  A report concerning plaintiff's probation indicates that plaintiff successfully completed
      a program requiring her to be drug tested regularly for twelve months beginning January 20,
26    2003.  All tests were negative over the one year period.  (Tr. at 103.)

coworkers and the public but was noted to have a strong tendency toward dependence.  As with the earlier report, plaintiff could act appropriately in regard to attendance and safety at work, as well as changes in a routine work setting. (Id.)

The ALJ did not meet his duty to develop the record in regard to plaintiff's mental impairment when he obtained only these reports.  He should have also considered past records.

In regard to plaintiff's visual problems, the ALJ obtained two examining opinions by ophthalmologist Dr. Durant on April 10, 2003, and May 4, 2004.  The earlier report diagnosed residual variable left exotropia[9] as a result of the motorcycle accident.  There was a restriction in up and down gaze in the left eye. (Tr. at 125.)  Plaintiff was also diagnosed with traumatic mydriasis[10] in the left eye and myopia.  Vision in the right eye was 20/20 and 20/25 in the left eye.  The left eye had significant decrease in up-gaze and down-gaze. (Id.)

The second exam by Dr. Durant provided similar results.  The only difference was that she was no longer diagnosed with myopia, but was newly diagnosed with a difference between her two eyes in color vision testing.  She reported it was easier to distinguish colors with the right eye. (Tr. at 252.)

The ALJ explained that although plaintiff claims to have double vision, both of the most recent eye exams do not indicate this diagnosis. (Id. at 14.)  Furthermore, these exams indicate good vision in both eyes.  The ALJ did credit plaintiff's testimony to preclude her from certain types of work in which lack of depth perception would be dangerous or where excellent vision is necessary.  As a result, he placed certain limitations in his hypothetical to the expert. (Id. at 15.)

\\\\\

---

[9]  Exotropia is "strabismus in which there is permanent deviation of the visual axis of one eye away from that of the other, resulting in diplopia [double vision]."  Dorland's Illustrated Medical Dictionary 475 (26th ed. 1985).

[10]  Mydriasis is "extreme or morbid dilation of the pupil."  Dorland's Illustrated Medical Dictionary 858.

9

1    Plaintiff argues that she has double vision, limiting her to reading for 15 minutes

2 at a time and requiring her to cover one eye when doing tasks.  She gets headaches if she tries to

3 look at something too long.  Therefore, she argues, the ALJ should have further supplemented

4 the record in this regard, including obtaining further information from the consulting source.

5 Plaintiff has cited to an article which states that exotropia may include the symptoms of double

6 vision, headaches, and eye strain with reading.  This court's own research also indicates that

7 potential symptoms of exotropia include diplopia (double vision), headaches, loss of

8 concentration when reading, avoiding reading, blurred vision, and eye strain.

9 www.strabismus.org.

10    Here, the ALJ rationalized that Dr. Durant did not diagnose double vision at either

11 consultation, and discounted plaintiff's claim of migraine headaches, explaining that these

12 complaints would not be credited because they were not documented in the medical record, and

13 they would not affect her residual functional capacity.  (Tr. at 14.)

14    The ALJ's explanation of why he did not fully credit the testimony of plaintiff's

15 family friend, Mr. Eaton, as to the effect of her visual impairment, is not satisfactory.  He stated

16 that Mr. Eaton's testimony for the most part was encompassed by the limitations the ALJ

17 included in the hypothetical.  (Tr. at 14.)  The hypothetical, however, did not include plaintiff's

18 need to cover her left eye due to double vision, when watching television or reading, or

19 headaches from doing too much of these activities, as Mr. Eaton testified.[11]  (Tr. at 279.)   The

20 ALJ did credit plaintiff's testimony regarding the visual limitations he decided to accept;

21 however, he refused to credit migraine headaches as they were not supported by any of the

22 medical records.  (Tr. at 14.)  The ALJ does not discuss the effect of normal headaches as a result

23 of reading or watching television, or her claim of double vision or need to cover her left eye at

25   [11]  Dr. Bradley also noted that plaintiff needed to cover her eye during the tests, which
slowed her down, and that lower scores on her memory tests were primarily due to visual
26 problems.  (Tr. at 254.)

1   certain times, other than to say Dr. Durant did not diagnose double vision.  Without crediting all

2   of Eaton's and plaintiff's testimony, and without obtaining a statement by an ophthalmologist as

3   to the effect of plaintiff's exotropia on work activities or at least the symptoms produced by this

4   disorder, the ALJ did not have all the information in which to determine the sequelae resulting

5   from the ophthalmic diagnosis.  He also did not have all the limitations in which to pose a

6   complete hypothetical to the vocational expert.  The ALJ did not fully and fairly develop the

7   record in regard to plaintiff's vision.  On remand, the ALJ should either seek further consultation

8   or a physician statement as to the effects of plaintiff's vision diagnosis on her work functions.

9         C.  Whether the ALJ Erred in Failing to Find All of Plaintiff's Impairments to be Severe

10        Plaintiff next argues that the ALJ should have found her post concussion disorder,

11   headaches and memory impairments to be severe.

12        At the second step of the disability analysis, an impairment is not severe only if it

13   "would have no more than a minimal effect on an individual's ability to work, even if the

14   individual's age, education, or work experience were specifically considered."  SSR 85-28.  The

15   purpose of step two is to identify claimants whose medical impairment is so slight that it is

16   unlikely they would be disabled even if age, education, and experience were taken into account.

17   Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987).  "The step-two inquiry is a de minimis

18   screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th

19   Cir. 1996).  At this step, the ALJ may decline to find a severe impairment *only if the evidence

20   establishes a slight abnormality that has no more than a minimal effect on an individual's ability

21   to work." Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005) (emphasis in original).

22        The ALJ only found to be severe plaintiff's lack of depth perception, lack of

23   excellent vision, dependent personality disorder, and mild organic brain damage.  As a result, the

24   ALJ limited work to jobs that did not involve working at unprotected heights, driving, or around

25   dangerous machinery.  She was also limited to tasks that were not detailed or complex or involve

26   such instructions.  (Tr. at 13.)

In regard to headaches, there is no medical evidence of migraines.  Plaintiff can only establish an impairment if the record includes signs – the results of "medically acceptable clinical diagnostic techniques," such as tests – as well as symptoms, i.e., plaintiff's representations regarding his impairment.  Ukolov v. Barnhart, 420 F.3d 1002, 1004-1005 (9th Cir. 2005).  The case will be remanded for visual impairment as well as any headaches resulting from that impairment, as discussed in the previous section.

Plaintiff's claimed memory loss is discounted for the same reasons.  There is no evidence of this impairment in the record.  In fact, Dr. Bradley noted that to the extent plaintiff was delayed in completed the testing, it was because she had to cover her eye throughout.  (Tr. at 254.)  Furthermore, this psychologist noted that the memory scores were lower as a result of "visual difficulties."  (Id.)  She did not limit plaintiff's functioning due to memory loss.  This opinion is supported by the opinion of the state agency examiner.  (Tr. at 168.)  Plaintiff had the burden of proof at this step of the sequential analysis, and failed to meet it.  See Bowen v. Yuckert, supra, 482 U.S. at 146, n.5.

D.  Non-exertional Impairments

Plaintiff alleges that the ALJ failed to consider the non-exertional impairments found the by the ALJ in regard to the previous disability determination, including double vision, deficiencies of concentration, persistence, and pace, failure to complete tasks in a timely manner, repeated episodes of deterioration or decompensation in work like settings, and severe memory, visual and balance problems.  Other than the visual disability noted earlier, which will be considered on remand, the court declines to consider the other nonexertional impairments alleged here.  Again, however, on remand the ALJ should review past records and determine the relevance of the past recorded condition to the time period at issue.

E.  Lay Witness Testimony

Plaintiff claims that the ALJ should have considered the testimony by Mr. Eaton regarding plaintiff's double vision, need to cover one eye, headaches, memory problems,

12

1   migraines, and inability to complete tasks.

2         An ALJ is required to "consider observations by non-medical sources as to how

3   an impairment affects a claimant's ability to work." Sprague v. Bowen, 812 F.2d 1226, 1232

4   (9th Cir. 1987). "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ

5   must take into account, unless he or she expressly determines to disregard such testimony and

6   gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir.

7   2001) (citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)). Similar to the ALJ's role

8   in evaluating the testimony of a claimant, when evaluating the testimony of a lay witness "[t]he

9   ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for

10  resolving ambiguities." Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998) (quoting

11  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

12        The Ninth Circuit has determined that the ALJ must properly discuss lay witness

13  testimony, and that any failure to do so is not harmless unless no reasonable ALJ, when fully

14  crediting the testimony, could have come to a different disability determination. Stout v.

15  Commissioner, 454 F.3d 1050 (9th Cir. 2006).

16        The ALJ found Mr. Eaton's testimony to be generally credible, and stated he was

17  including the limitations set forth in his testimony. This testimony was previously discussed in

18  section B and to the extent it supports plaintiff's visual problems and resulting symptoms, it will

19  be fully considered on remand. Plaintiff's other alleged impairments were appropriately rejected,

20  as discussed in section C.

21      F.  Whether the ALJ Properly Assessed Plaintiff's Credibility

22        Plaintiff asserts that the ALJ found plaintiff not fully credible, and thereby ignored

23  all the medical evidence from plaintiff's motorcycle accident.

24        The ALJ determines whether a disability applicant is credible, and the court defers

25  to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater,

26  94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit

1   credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

2   Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

3   supported by "a specific, cogent reason for the disbelief").

4               In evaluating whether subjective complaints are credible, the ALJ should first

5   consider objective medical evidence and then consider other factors.  Bunnell v. Sullivan, 947

6   F.2d 341, 344 (9th Cir.1991) (en banc).  The ALJ may not find subjective complaints incredible

7   solely because objective medical evidence does not quantify them.  Id. at 345-46.  If the record

8   contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ

9   then considers the nature of the alleged symptoms, including aggravating factors, medication,

10  treatment, and functional restrictions.  See id. at 345-47.  The ALJ also may consider the

11  applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or

12  inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

13  and (3) daily activities.[12]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally

14  SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician

15  and third party testimony about nature, severity, and effect of symptoms, and inconsistencies

16  between testimony and conduct, may also be relevant.  Light v. Social Security Administration,

17  119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations,

18  see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for

19  medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Absent

20  affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony

21  must be clear and convincing.  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595,

22  599 (9th Cir. 1999).

23
            [12]  Daily activities which consume a substantial part of an applicants day are relevant.
24  "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
    activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
25  any way detract from her credibility as to her overall disability.  One does not need to be utterly
    incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
26  (quotation and citation omitted).

1    In this case, the ALJ's credibility analysis was limited to finding plaintiff's

2   testimony regarding her left eye "somewhat credible," but that double vision was not diagnosed

3   in either exam; her testimony regarding migraine headaches not credible because they were not

4   documented in the medical records; and she was only superficially cooperative during her mental

5   status exam.  (Tr. at 14, 12.)  He then made the formal finding that plaintiff's testimony was not

6   fully credible in regard to her double vision, migraine headaches, and ongoing memory deficits,

7   for the reasons stated in the decision.  (Id. at 15.)

8    The ALJ failed to fully evaluate plaintiff's credibility, ending his analysis after

9   referring only to the objective medical evidence and going no further, as required by the

10   aforementioned line of cases.  On remand, the ALJ shall fully analyze plaintiff's credibility in

11   light of Ninth Circuit precedent.

12    G.  Hypothetical to Vocational Expert

13    Plaintiff's final argument is that the hypothetical posed to the expert did not

14   include her limitation of double vision, as well as other limitations defined by the ALJ in the

15   previous disability determination.

16    Hypothetical questions posed to a vocational expert must include all the

17   substantial, supported physical and mental functional limitations of the particular claimant.

18   Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d

19   789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the

20   expert's testimony as to available jobs in the national economy has no evidentiary value.

21   DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d

22   947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE

23   had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all

24   limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by

25   other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions,

26   based on alternate interpretations of the evidence, substantial evidence must support the

15

hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).[13]

The limitations imposed by the ALJ in the previous determination are not relevant here for the reasons stated earlier.  Plaintiff's double vision must be explored on remand as the hypothetical to the expert upon which the ALJ relied did not account for double vision.  In fact, when asked whether plaintiff could do the jobs outlined if she had double vision and needed to cover her left eye, the expert responded in the negative.  (Tr. at 285.)

On remand, the ALJ will determine whether the vocational expert needs to be recalled based on the limitations presented after further workup of plaintiff's visual impairment.

CONCLUSION

Accordingly, plaintiff's Motion for Judgment on the Pleadings is GRANTED in part pursuant to Sentence Four of 42 U.S.C. § 405(g), the Commissioner's Cross Motion for Summary Judgment is DENIED, and this matter is remanded for further findings in accordance with this order.  The Clerk is directed to enter Judgment for plaintiff.

DATED: 3/2/07

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Hall1050.ss.wpd

---

[13] Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial evidence or reject them if they are not.  Id. at 756-757.